# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| BALTIC CAPTAIN SHIPPING | § | |
| COMPANY LIMITED, | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-06-2499 |
| | § | |
| BLESSEY ENTERPRISES, INC., | § | |
| *et al.*, | § | |
|     Defendants. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This maritime case was tried to the Court August 4-6, 2008.[1]  Each party presented evidence through trial exhibits, live witnesses, and deposition testimony and exhibits.  Jurisdiction is proper pursuant to Rule 9(h) and 28 U.S.C. § 1333.  There is no objection to personal jurisdiction over Defendants or to proper venue in this federal district.

Having heard and observed the witnesses who testified at trial, having considered the exhibits introduced by the parties, having reviewed all matters of

---

[1]     The parties presented opening statements prior to August 4, 2008, and they presented closing arguments on August 13, 2008.

record in this case, and having considered the arguments presented by counsel, the Court makes the following findings of fact and conclusions of law.[2]

## I.  **GENERAL FACTUAL BACKGROUND**[3]

Plaintiff Baltic Captain Shipping Company Limited ("Baltic") is the owner of the M/T BALTIC CAPTAIN I ("BALTIC CAPTAIN"), a chemical/parcel tanker with an overall length of 599 feet, a breadth of 89.7 feet, and a maximum draft of 31.34 feet. The BALTIC CAPTAIN is operated by Interorient Navigation Co., Ltd. ("Interorient"). Defendants Blessey Marine Services, Inc. and Blessey Enterprises, Inc. (collectively, "Blessey") owned and operated the THOMAS E. ROLLINS ("ROLLINS"), an inland pushboat fitted with twin diesel engines equipped with flanking rudders.

On September 2, 2005, the BALTIC CAPTAIN entered the Texas City Channel under the command of Captain Evgeny Antsiferov. Also on board was Captain Christos Sotirelis, a Galveston, Texas City Pilot. The BALTIC CAPTAIN has an onboard computer system called "ARPA" that displays other vessels in the area with

---

[2]     The Court explains the evidence and uses various forms of the word "find" to indicate a finding of fact, and sets forth legal principles and uses forms of the words "hold" and "conclude" to indicate a conclusion of law. To the extent a finding of fact is more properly a conclusion of law, and to the extent a conclusion of law is more properly a finding of fact, it should be so construed.

[3]     Additional factual findings will be included in relevant sections below.

their course, speed, distance to closest point of approach ("CPA"), and time to CPA. The ARPA system does not, however, identify the other vessels. The BALTIC CAPTAIN also had an onboard computer system called "AIS" that identifies the other vessels in the area.

The Texas City Channel has a project width of 400 feet and a depth of 40 feet, constituting a narrow and confined waterway where the Inland Navigation Rules Act of 1980 ("Inland Rules") apply. Of significance, Inland Rule 9 prohibits a vessel from crossing a narrow channel "if such crossing impedes the passage of a vessel which can safely navigate only within that channel." It is clear that the BALTIC CAPTAIN had the right of way as it proceeded into the Texas City Channel.

Also on September 2, 2005, the ROLLINS was leaving the Houston Ship Channel enroute to the Intracoastal Waterway. The ROLLINS, under the command of Captain Rodney Adams, was pushing two barges in tow resulting in an overall length of 676.6 feet, a breadth of 54 feet, and a maximum draft of 11 feet.

It is undisputed that the ROLLINS crossed the Texas City Channel in front of the BALTIC CAPTAIN, violating Rule 9 of the Inland Rules. The BALTIC CAPTAIN turned to starboard to avoid a collision and went aground.

The BALTIC CAPTAIN twice attempted to refloat the vessel. First, it used its own engines in an attempt to remove itself from the grounding. In a second attempt,

it used two harbor tugs together with the vessel's engines.  Both attempts were unsuccessful.

Interorient entered into a Lloyd's Open Form Salvage Agreement Contract ("LOF") with Titan Maritime LLC ("Titan") for the salvage of the BALTIC CAPTAIN.  Interorient, through its London solicitors, settled Titan's salvage claim and paid Titan $1,780,000.00 for its salvage services in connection with the grounding of the BALTIC CAPTAIN.  Plaintiff seeks to recover in this lawsuit this settlement amount, the legal fees charged by its London solicitors, and additional damages it claims to have incurred as a result of the grounding.

## II.   LIABILITY

### A.   Applicable Legal Principles

Liability in marine casualty cases is based on a finding of fault, which is to be apportioned between the parties using traditional concepts of prudent seamanship and reasonable cause, statutory and regulatory rules, and recognized customs and usage. *See Stolt Achievement, Ltd. v. Dredge B.E. LINDHOLM*, 447 F.3d 360, 364 (5th Cir. 2005).  Courts have found under the specific facts of the cases before them that a party's violation of a rule is not a causal factor contributing to the plaintiff's injury where the injury is caused by "a totally unanticipated possible hazard not within the

intended protection" of the particular rule.  *See, e.g., Magnolia Towing Co., Inc. v. Atchison, Topeka & Santa Fe Ry. Co.*, 764 F.2d 1134, 1138 (5th Cir. 1985).

The Inland Rules are applicable in this case.  In addition to Inland Rule 9 described above, Inland Rule 5 requires generally that the vessel maintain a proper look-out, and Inland Rule 6 requires that the vessel proceed at a safe speed.  Inland Rule 34 requires a vessel to sound its whistle – thereby also activating emergency lights on the vessel – when two vessels are in sight of each other, are approaching each other, and "either vessel fails to understand the intentions or actions of the other, or is in doubt whether sufficient action is being taken by the other to avoid collision."[4]

### B.    Factual Findings Regarding the Grounding

At 2:02 a.m. on the morning of September 2, 2005, the ROLLINS radioed that it was outbound and "turning westbound."  The BALTIC CAPTAIN reported that it would be at the Intracoastal Waterway ("ICW") in twelve minutes.

At 2:08 a.m., the pilot onboard the BALTIC CAPTAIN tried unsuccessfully to contact the ROLLINS on the ship's radio.  At that time, the two vessels were between 1.5 miles and 2 miles apart.  The BALTIC CAPTAIN's master ordered the BALTIC

---

[4]    A vessel is not required to sound the whistle if it has reached an agreement with the other vessel.  *See* Inland Rule 34(h).  It is clear in this case, however, that the BALTIC CAPTAIN and the ROLLINS had not reached an agreement regarding either vessel's course of action.

CAPTAIN slowed to dead slow ahead because he was concerned about what the ROLLINS was doing and about the risk of a collision.  *See* Deposition of Evgeny Antsiferov, pp. 103-04.  At 2:08 a.m., the ROLLINS could have reentered the Houston Ship Channel.  It is undisputed that the BALTIC CAPTAIN did not sound its danger signal, which would have activated a flashing light on the vessel.

At 2:09 a.m., the ROLLINS reported on Channel 13 of the radio that it was turning out of the ship channel westbound for the Pelican Cut.  The BALTIC CAPTAIN inquired whether the ROLLINS was going to slow down, but the ROLLINS did not respond.  It is undisputed that the ROLLINS turned across the channel impeding the path of the BALTIC CAPTAIN.

At 2:10 a.m., the BALTIC CAPTAIN realized that it was in a close situation with the ROLLINS.  At 2:12 a.m., the BALTIC CAPTAIN turned hard to starboard, passed the ROLLINS, tried to turn back to port, but was grounded.  The grounding occurred at 2:15 a.m.

On October 8-9, 2005, Capt. Nikolajs Romanovs, Interorient's Marine Superintendent, conducted an investigation into the cause of the grounding of the BALTIC CAPTAIN.  Capt. Romanovs reviewed documents and interviewed Capt. Antsiferov and others who had been on board the BALTIC CAPTAIN on

September 2, 2005.  Capt. Romanovs disclosed the results of his investigation to Hernani Padilla, Interorient's Marine and Quality Manager.

Padilla prepared a Root Cause Analysis Report [Defense Exhibit 58].  Padilla identified six possible direct or root causes of the grounding.  The first cause identified by Padilla was the ROLLINS's violation of Inland Rule 9 when it crossed in front of the BALTIC CAPTAIN.  Each of the other six possible causes involved matters attributable to the BALTIC CAPTAIN.  These were (a) lack of knowledge of the tidal flow in the channel; (b) late radio contact between the BALTIC CAPTAIN and the ROLLINS; (c) an inadequate conference between the master and the pilot; (d) the failure of the master to use his authority effectively; and (e) the lack of an effective use of Bridge Team Management technique.

Padilla also recommended actions to be taken to prevent a similar grounding in the future.  These recommendations included establishing a more effective Pilot/Master exchange of information, and encouraging a risk assessment by the vessel prior to entering channels, particularly at nighttime.  Padilla also recommended encouraging masters to use less speed when navigating in channels with other vessels in sight.

### C.    **Defendant's Liability**

It is undisputed that the ROLLINS violated Inland Rule 9 when it crossed in front of the BALTIC CAPTAIN, impeding its passage in the narrow channel.  The Court finds that this was the primary cause of the grounding of the BALTIC CAPTAIN.  The Court also finds that Capt. Adams's lack of knowledge of and familiarity with the ROLLINS's onboard computer systems was negligent and contributed to the grounding.

### D. <u>Relative Liability of Plaintiff</u>

The Court finds that Plaintiff also was negligent in ways that constitute causal factors contributing to the grounding of the BALTIC CAPTAIN.  The captain failed to engage in an adequate, meaningful dialogue with the pilot.  The captain had never been in the Galveston Bay or Houston or Texas City channels before, and the pilot had never been on the BALTIC CAPTAIN.  The captain specifically inquired about the traffic in the area, and the pilot responded that it was "normal" – a response that provided no meaningful information to the captain unfamiliar with the area.  The pilot failed to provide the captain with adequate information regarding the tide and its effect on the vessel's speed.  The master and the pilot did not discuss the appropriate speed for the vessel for each of the various legs of the transit between the time the pilot came on board and the vessel reached its destination.  The communication between the pilot

and the master of the BALTIC CAPTAIN was more *pro forma* than meaningful and its inadequacies contributed to the grounding of the vessel.

The BALTIC CAPTAIN was traveling at an unreasonably fast speed under the conditions.[5]  The captain was unfamiliar with the area, it was nighttime, there was traffic in the area, and the channel was a narrow one in which the BALTIC CAPTAIN had limited maneuverability.  Contrary to Interorient's Safe Navigation Manual, the vessel's plan for the voyage did not include an analysis of the appropriate speed for each of the various segments of the voyage.  More importantly, the following tide was causing the vessel to travel at a higher speed than expected.  The Chief Mate, Andrey Makarov, believed incorrectly that the BALTIC CAPTAIN was traveling at approximately 11 knots, more than 2 knots more slowly than it was actually traveling. The BALTIC CAPTAIN anticipated arriving at the ICW at 2:14 a.m., but apparently in part because the tide was causing it to travel at a higher speed, it arrived several minutes sooner.  According to the AIS on the BALTIC CAPTAIN, the vessel was traveling at 13.6 knots at 2:08 a.m., and it did not slow significantly when the speed changed to dead slow ahead at 2:08 a.m., still going more than 13 knots at 2:10 a.m.

---

[5]     Capt. Antsiferov testified in his deposition that the speed should be based on all the surrounding circumstances.  *See* Antsiferov Depo., p. 172.

The BALTIC CAPTAIN's speed and its failure to comprehend adequately the effect of the tide were causal factors contributing to the grounding.

The BALTIC CAPTAIN also failed to sound the danger signal, and thereby activate flashing warning lights on the vessel, in violation of Inland Rule 34.  At 2:08 a.m. on September 2, 2005, the BALTIC CAPTAIN was in sight of the ROLLINS, the two were approaching each other, the BALTIC CAPTAIN was unsure what the ROLLINS was going to do, and the BALTIC CAPTAIN was in doubt as to whether the ROLLINS would take sufficient action to avoid a collision.  *See, e.g.*, Antsiferov Depo., pp. 103-04 (at 2:08 a.m., Antsiferov had concern about what the ROLLINS was doing and about the risk of a collision).  At that time, the BALTIC CAPTAIN was required by Inland Rule 34 to sound its danger signal.  Although it is unlikely that the ROLLINS crew would have heard the sound of the danger signal, the ROLLINS likely would have seen the BALTIC CAPTAIN's flashing lights activated with the danger signal.  The vessels were at least 1.5 miles apart and the ROLLINS still had adequate time to abort his turn and return to the Houston Ship Channel, thereby avoiding the close situation with the BALTIC CAPTAIN.

It is clear that the primary cause of the grounding of the BALTIC CAPTAIN was the ROLLINS's violation of Inland Rule 9 when it crossed the channel impeding the BALTIC CAPTAIN's path.  There were other causal factors attributable to

Plaintiff, however, that contributed the grounding. The Court assesses the relative fault of Plaintiff at 30% and the relative fault of Defendants at 70%.

## III.   DAMAGES

### A.   Reasonableness of LOF, Settlement, and Solicitor's Fees

In this case, the largest element of damages is the cost of salvage operations provided by Titan. Salvage is the rendering of assistance to protect a ship and its cargo in a situation where the ship and/or its cargo are in distress. Compensation for a salvage operation is based on what is expended by the salvage company plus a "reward" or incentive to encourage people to engage is salvage.

All costs reasonably incurred in mitigation of damages are recoverable, subject to the apportionment of fault. *See Domar Ocean Transp., Ltd. v. Independent Refining Co.*, 783 F.2d 1185, 1191 (5th Cir. 1986). Defendants challenge the BALTIC CAPTAIN's decision to enter into the LOF and the amount of the salvage settlement as unreasonable and a failure to mitigate Plaintiff's damages. Defendants have the burden to prove failure to mitigate. *See Tennessee Valley Sand & Gravel Co. v. M/V DELTA*, 598 F.2d 930, 933 (5th Cir. 1979). If Plaintiff acted reasonably, "the fact that [its] efforts turn out to be unsuccessful and actually increase the loss does not preclude recovery for all expenses incurred in the process." *See id.* In evaluating the reasonableness of Plaintiff's actions, "the court must consider that the necessity for

decision-making was thrust upon [it] by the defendant, and judgments made at times of crisis are subject to human error."  *Id.*  The law does not require "infallibility" and "will allow the injured party a wide latitude in determining how best to deal with the situation."  *Id.* (citations omitted).

### ***Decision to Enter into the LOF*** –

LOFs, while prevalent in Europe, are not generally used in the United States. Defendants argue that an LOF was not appropriate in this case.

After the grounding of the BALTIC CAPTAIN, the ship's crew attempted to use the vessel's engines to refloat the vessel.  When that proved unsuccessful, an attempt was made to refloat the vessel using the engines and tugboats.  This second attempt was also unsuccessful.

At that point, the BALTIC CAPTAIN was a fully loaded tanker carrying low sulpher vacuum gas oil ("VGO") sitting aground on soft mud for part, but not all, of the full hull length.  The vessel was aground in an area where the Texas City Ship Channel, the Houston Ship Channel, and the ICW converge.  As a result, the owners of the BALTIC CAPTAIN were reasonable in their serious concern about the environmental risk and the multiple safety risks to people and property presented by the vessel's location.

The grounding of the BALTIC CAPTAIN occurred only days after Hurricane Katrina struck the upper Gulf Coast.  In the aftermath of Hurricane Katrina, thousands of vessels needed salvage, including barges, fishing boats, and other types of vessels. Titan advised Plaintiff that all salvage assets were tied up because of the hurricane. Some assets were being used for salvage operations and others were themselves blocked and inaccessible.  Titan told Plaintiff that it would give the salvage of the BALTIC CAPTAIN its full attention only if Plaintiff signed an LOF.  Titan made it clear that an LOF was required for the vessel to be refloated as promptly as possible. Otherwise, the BALTIC CAPTAIN would simply be put "in line" for service.  Jan Lissow, Interorient's Managing Director, testified in his deposition that he would have preferred a salvage arrangement other than an LOF, but he reasonably believed that he had no other options under the circumstances presented by Titan.

Titan took draft readings to determine what the depths were and to determine the bottom gradient of the area on which the BALTIC CAPTAIN was grounded. Titan established a point of contact with the United States Coast Guard, passing information through the Coast Guard and obtaining Coast Guard approval for the salvage plan.  Titan originally believed incorrectly that the cargo on the BALTIC CAPTAIN was gasoline and, as a result, sought to hire different barges for lightering

because many shippers oppose mixing cargoes.  The Titan also put a firefighting system on standby.

Titan obtained the necessary equipment from at least two different companies. It does not appear from this record that any single company had all the necessary equipment in the area and available for the salvage of the BALTIC CAPTAIN.  As a result, Titan coordinated the salvage operation, which involved lightering the cargo from the tanker, and successfully refloated the vessel.

### *Settlement of Titan's Salvage Claim* –

The LOF required that Titan's salvage claim be submitted to binding arbitration before a sole arbitrator.  Prior to the arbitration, the parties engaged in private negotiations.  Titan began the negotiations at $5 million (the value of the security), but immediately dropped its demand to $2.5 million.

Plaintiff's London solicitor, Julian Clark, conducted a "Round Robin" by obtaining from colleagues at his firm evaluations of the potential salvage award.  The evaluations were based on "balanced information" and ranged between $500,000.00 and $2.75 million.  Clark's own evaluation resulted in a proposed settlement of $1.5 million.  Clark eliminated the highest and the lowest figures, then averaged the others, resulting in a "Round Robin" figure of approximately $1.1 million.

After the Round Robin was conducted, the parties learned that Michael Howard would be their arbitrator.  Titan's solicitor, Tony Goldsmith, said that he had been involved in a previous arbitration with Howard in a "very similar case" (but, according to Goldsmith, "less serious" than the BALTIC CAPTAIN) in which Howard awarded $1.75 million.  Although Goldsmith provided information regarding the salvage operation in that similar case, arbitration awards are not public and there is nothing in the record to indicate that Clark or anyone else on Plaintiff's behalf verified the amount of the salvage award alleged by Goldsmith.

Also after the Round Robin was completed, Titan claimed that the award would be higher because of the "Katrina effect."  Titan's solicitors threatened to make this a major factor in their presentation to the arbitrator, arguing at least in part that the decreased supply and the increased demand for salvage services following Hurricane Katrina warranted an award higher than under normal circumstances.  Plaintiff's solicitors were concerned about the "Katrina effect" as a possible "wild card" in the settlement negotiations.  John Langley, the solicitor for the cargo interests – interests aligned with Plaintiff's – began to argue that the salvage award in this case could exceed $2 million, plus interest and costs.

During a negotiation meeting in January 2006, Titan's principal, Dan Schwall, provided to Clark what appeared to be a copy of Goldsmith's Round Robin figures,

showing that Goldsmith evaluated the salvage at $1.8 million.  Soon thereafter, the parties settled Titan's salvage claim for $1.78 million, including interest and costs. Plaintiff's London solicitors charged total fees in the amount of 29,600 Pounds Sterling.[6]

Article XIII of the 1989 Salvage Convention provides a list of factors to be considered in determining the appropriate value of a salvage operation.  The first factor is the value of the salvaged vessel.  In this case, the BALTIC CAPTAIN had an agreed valuation of $39 million.

The second factor is the skill and efforts of the salvor in preventing/minimizing harm to the environment.  Plaintiff's London solicitors recognized that Titan completed the refloating of the BALTIC CAPTAIN – including lightering 3,000 tons of VGO at a water location away from the normal discharge facility – without any damage to the environment.

The next factor is the measure of Titan's success.  It is undisputed that Titan successfully refloated the BALTIC CAPTAIN.  The refloating was accomplished in approximately two days and without any damage to the vessel.  Titan lightered 3,000 tons of cargo, which it then delivered directly to the waiting BP facility so the cargo

---

[6]    Defendants concede that if the LOF was reasonable, Plaintiff is entitled to recover its solicitor's fees and that those fees in this case are not unreasonable.

could be delivered promptly to the client refinery.  This was a decision that pleased the cargo clients.

The fourth factor is the nature and degree of the danger.  The London solicitors considered that the danger to the vessel and to the environment resulted primarily from the tanker resting only partially on soft mud instead of having the full length of the vessel resting on the mud.  This places undue stresses on the vessel.  It was also reasonable to perceive that the location of the BALTIC CAPTAIN aground at the confluence of three waterways created a safety risk from traffic in the area.

The fifth factor involves the skill and effort of the salvors in conducting the salvage operation.  During the salvage and settlement negotiations, there was no indication that Titan did not have the skill and effort necessary to refloat the BALTIC CAPTAIN.  Indeed, Titan appears to have been quite skilled in salvage operations.

The sixth factor is the time and expense of the salvage operation.  As was noted above, the salvage operation lasted only a little more than two days.  The total expense of the operation was approximately $300,000.00.  This amount is the expense element of the method of calculating compensation for a salvage operation.

The next factor is the risk of liability and other risks run by the salvors and/or their equipment.  In this case, the risk was negligible because Titan used equipment

obtained from other companies.  The London solicitors viewed this factor as a minor one in this case.

The eighth factor is the promptness of the services rendered.  The London solicitors considered that the refloating was handled promptly and that time was of the essence because, in a tanker grounding, the situation usually only gets worse as more time goes by.

The ninth factor is the availability and use of vessels or other equipment. Plaintiff's London counsel believed it was in connection with this factor that the "Katrina effect" could be an important consideration for the arbitrator.  Titan argued that it was difficult to obtain the necessary equipment and vessels in the aftermath of the hurricane.  Indeed, Titan in fact obtained equipment from different companies.

The tenth and final factor is the state of readiness and efficiency of the salvor's equipment.  In this regard, the London counsel noted that Titan had provided efficient support vessels, staff, and personnel.  Additionally, Titan's ability to perform the salvage operation successfully and promptly was viewed as evidence of its readiness and efficiency.

Having reviewed the evaluation of these factors performed by Plaintiff's London solicitors, the Court finds that the settlement amount was reasonable under the unique circumstances presented in this case.  Although a $1.78 million settlement

of a claim in which expenses were only $300,000.00 seems to an "outsider" to be highly excessive, the basis for this high settlement amount is inherent in the nature of salvage awards and the maritime industry's desire to encourage salvage. Plaintiff was represented by experienced, competent counsel who were faced with what they believed, and may well have been, the "Katrina effect wild card." In the unique circumstances presented by this case, the Court finds the settlement amount was reasonable. Plaintiff is entitled to recover 70% of the $1.78 million settlement award, as well as 70% of the 29,600 Pounds Sterling paid to its counsel in London.

## B. <u>Other Damages</u>

A plaintiff is also entitled to recover all other damages incurred as a consequence of a grounding, subject to apportionment of liability and "only to the extent that those damages can be proven with reasonable certainty." *See Johnson v. Otto Candies, Inc.*, 828 F.2d 1114, 1119 (5th Cir. 1987) (specifically addressing damages for loss of use); *see also Baker Hughes Oilfield Operation, Inc. v. Seabulk Tankers, Inc.*, 2004 WL 1290576, *2 (E.D. La. June 8, 2004).

Plaintiff has not presented evidence supporting "with reasonable certainty" the vast majority of its other claimed damages. Plaintiff's expert merely added together numbers from invoices; he engaged in no analysis of which charges were actually attributable to the grounding of the BALTIC CAPTAIN. Although the expert deleted

any charges that he, a Certified Public Accountant, easily could determine from the face of the invoices were not related to the grounding, it is apparent that other unrelated charges were included in his computation.  The calculation included the pilot's charge and the base agency fee which appear likely to have been incurred even absent the grounding.  The calculation also includes hotel charges for crew members for nights *before* the grounding.  Most importantly, Plaintiff presented no evidence that any of the invoices were paid, in whole or in part.  Defendants, however, do not challenge $50,400.00.  *See* Defendants' Proposed Findings of Fact and Conclusions of Law [Doc. # 18], ¶ 56.

There are other unpersuasive aspects of Plaintiff's incidental damages claim, such as the damages sought for lost use of the vessel based on more than six days, when the captain advised that the vessel was off hire only 2.5 days.[7]  Defendants concede that Plaintiff incurred $57,633.33 in lost hire damages for the 2.5 days it was off hire as a result of the grounding.

---

[7]     Plaintiff claims unpersuasively that the additional delay in moving the vessel is compensable because it resulted from delays in obtaining security for the LOF because of the Labor Day holiday weekend.  Plaintiff has not presented evidence, however, that the companies providing security were closed for the Labor Day weekend or that security could not have otherwise been obtained sooner.

Defendants have proposed an award of incidental damages to Plaintiff in the amount of $108,033.33.  Plaintiff – who has the burden of proof – has not adequately established with reasonable certainty that it is entitled to recover more than this sum.

### C.    Prejudgment Interest

"Under maritime law, the awarding of prejudgment interest is the rule rather than the exception."  *Reeled Tubing, Inc. v. M/V CHAD G*, 794 F.2d 1026, 1028 (5th Cir. 1986).  The practice of awarding prejudgment interest from the date of the loss is to "ensure that the injured plaintiff is compensated for the use of funds to which the plaintiff was entitled, but which the defendant had use of prior to judgment."  *See id.* The trial court has the discretion, however, to deny prejudgment interest where "peculiar circumstances would make such an award inequitable."  *See id.*   Under certain circumstances, such as an unreasonable delay in filing suit, the Court may "properly exercise its discretion to award prejudgment [interest] only to the date of judicial demand."  *See id.* at 1029.

In this case, there was no unreasonable delay in filing the lawsuit, and the dispute regarding liability was no different from all contested, nonfrivolous maritime

cases.  As a result, the Court awards prejudgment interest from the date of loss to the date of judgment at the rate of 3.77% per annum.[8]

## IV.  CONCLUSION

Both the BALTIC CAPTAIN and the ROLLINS contributed to the grounding of the BALTIC CAPTAIN on September 2, 2005.  The Court assesses Plaintiff with 30% of the relative fault and assesses Defendants with 70% of the relative fault.

Plaintiff's decision to enter into the LOF and to settle Titan's salvage claim for $1,780,000.00 was reasonable under the unusual circumstances presented in this case, and the 29,600 Pounds Sterling that Plaintiff paid to its London solicitors was reasonable.  Plaintiff is entitled to recover $108,033.33 in additional damages.  The Court will issue a separate final judgment consistent with these Findings of Fact and Conclusions of Law.

**SIGNED** at Houston, Texas, this **29th** day of **August, 2008**.

Nancy F. Atlas
United States District Judge

---

[8]   Setting the rate of interest is within the district court's broad discretion.  *See, e.g., United States v. Cent. Gulf Lines, Inc.*, 974 F.2d 621, 630 (5th Cir. 1992); *Nichols v. Weeks Marine, Inc.*, 513 F. Supp. 2d 627, 640 (E.D. La. 2007).  In this case, the federal postjudgment interest rate in effect on September 2, 2005, was 3.77%.  The Court finds this to be a reasonable and appropriate rate in this case.